**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| R.S.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| D.L.K. | : | |
| | : | |
| Appellant | : | No. 2007 EDA 2018 |

Appeal from the Order Entered June 11, 2018
In the Court of Common Pleas of Bucks County
Family Division at No(s): A06-12-61169-C

BEFORE:   OTT, J., DUBOW, J., and STRASSBURGER*, J.

MEMORANDUM BY OTT, J.:                **FILED JANUARY 16, 2019**

Appellant, D.L.K. ("Mother"), appeals from the June 11, 2018 order in the Court of Common Pleas of Bucks County ("trial court") that granted her partial physical custody and R.S.K. ("Father") primary physical custody of the parties' four children.[1]  The order granted Father sole legal custody regarding the selection and treatment of the children by a psychologist or psychiatrist, and the order granted the parties shared legal custody in all other circumstances.  Upon careful review, we affirm.

---

* Retired Senior Judge assigned to the Superior Court.

[1] The children are P.K., a female, born in April of 2002; S.K., a male, born in December of 2003; F.K., a male, born in October of 2005; and N.K., a female, born in July of 2009.

In its opinion accompanying the subject order, the trial court set forth the extensive factual and procedural history of this case, which the record evidence supports. In its opinion, the court attached and incorporated Exhibit A, "Time table of significant events," which specifically sets forth the procedural history of this case. *See* Trial Court Opinion, 6/11/18, at Exhibit A. We adopt the trial court's opinion in its entirety herein. *See* Trial Court Opinion, 6/11/18.

By way of background, the underlying matter commenced in June of 2011, upon Father filing a complaint in divorce, and, as best we can discern, a simultaneous child custody action in the First Circuit Court of Hawaii, where the parties had resided since 2007. In November of 2011, Father relocated to Doylestown, Bucks County, where he continued to reside at the time of the subject proceedings. Mother temporarily relocated to the home of her father in Staten Island, New York. In December of 2012, Mother returned to Hawaii, where she has remained. Protracted custody proceedings have ensued in both Hawaii and the trial court. In December of 2014, the trial court and the Hawaiian court determined that subject matter jurisdiction resided in the trial court.[2]

---

[2] The Honorable Alan M. Rubenstein of the Court of Common Pleas of Bucks County presided over the underlying custody matter until he recused himself by order dated April 6, 2017. The Honorable Susan Devlin Scott presided over the subject proceedings.

This appeal arises from Mother filing a petition on October 5, 2016, to relocate the children to Hawaii and to modify the existing temporary custody order. The existing temporary custody order, dated March 31, 2016, granted Father sole legal and physical custody and suspended Mother's custodial rights pending further order. The existing order resulted from Mother's failure to return the children to Father from Hawaii at the end of their 2016 spring break pursuant to the October 19, 2015 agreed-upon custody order.[3] The trial court found as follows, which the testimonial evidence supports.

> When Mother illegally withheld the children in March, 2016, [the existing custody order] was issued. . . . Father then went to Hawaii to gain custody of the children with the assistance of the police. Mother attempted to flee with the children in a pick-up truck, and [P.K.] fell out of the back of the truck.

Trial Court Opinion, 6/11/18, at 3.

The trial court held an evidentiary hearing on Mother's petition that lasted for eleven days.[4] The court issued temporary orders at the conclusion

---

[3] The October 19, 2015 custody order granted Father primary physical custody during the school year and Mother partial physical custody during the children's spring break, *inter alia*; Mother primary physical custody during the summer; and the parties shared legal custody.

[4] The hearing occurred on February 3, 2017, June 8, 2017, September 21, 2017, September 25-26, 2017, January 29-31, 2018, and May 23-25, 2018. Father was represented by counsel during the entire proceeding. Mother was represented by counsel during the first three hearing dates, and she represented herself *pro se* thereafter.

of each of the hearing dates granting Mother partial physical custody when she was present on the East Coast.

Mother and Father testified on their own behalf. Father presented the testimony of his paramour, K.M.; D.M., a Doylestown resident whose daughter has been a friend of P.K. since they were in fourth grade; and M.W.S., Father's aunt, who also lives in Doylestown. The children testified in the courtroom in the presence of Mother, Father, and Father's counsel on February 3, 2017, and May 25, 2018.[5]

On February 3, 2017, P.K., then age fourteen and in ninth grade, testified that she wants to live with Mother, "wherever she pleases, whether that be New York or Hawaii." N.T., 2/3/17, at 19. She stated, "I want the option of seeing my dad if I want to, but I need time to heal from all of this, very badly." *Id.* P.K. testified that she has been traumatized by "the entire past five years of dealing with police officers and being in court." *Id.* at 16-20, 34. P.K. blames Father for the protracted custody litigation and the need for police officers to retrieve the children from Mother's custody. *Id.* at 22-23. P.K. maintained her preference to live with Mother during her testimony on May 25, 2018. *See* N.T., 5/25/18, at 14-15, 30-31.

S.K., age thirteen and in seventh grade on February 3, 2017, testified that he would like to go to Hawaii and live with Mother. He explained, "I

---

[5] In July of 2015, in prior custody proceedings not related to the subject order, the children likewise testified. Trial Court Opinion, 8/10/18, at 4-5.

haven't seen her in a very long time." N.T., 2/3/17, at 64. "[Hawaii is] where I was born. . . . I kind of just prefer her over my dad." *Id.* at 65. S.K. continued on direct examination by Mother's counsel:

Q. And why [do you prefer Mother over Father]?

A. He's done a lot of stuff that he's blamed on her, and I just don't think it's very fair. And, you know, I just don't trust him as much anymore.

Q. And would you care to explain?

A. Oh, he said that my mom hit him with her truck and that's not true, because I was actually there. He jumped on to the side of it and tried to hold on and like brake it or hit the brakes or something. So that was completely his fault.

*Id.* at 65.

With respect to the pick-up truck incident, S.K. testified that the two younger children were inside the truck with Mother, who was the driver, and he and P.K. "decided we should jump in the back." *Id.* at 71-72. He explained, "we hopped in through that thing that folds down and then we closed it back up." *Id.* at 71. S.K. continued on cross-examination by Father's counsel, "We started to pull away and [Father] jumped on, and I guess he like fell on to the road while [the truck] was driving, and then he like, I don't know, just fell off." *Id.* at 72.

Q. What happened to [P.K.] . . ?

A. She was trying to climb in, and it started to roll away and she fell off of the back of the truck.

Q. When you say started to roll away, you mean your mom probably like hit the gas, right?

A. Yes.

Q. So your mom hits the gas and your sister, [P.K.], fell off the back of the truck?

A. Mm-hmm.

Q. Because she wasn't really even in the bed yet?

A. She was about to get in and then it pulled away.

Q. And so what happened to [P.K.]?

A. She was just kind of on the street. I don't know if she – she started to walk towards the truck, but she was fine overall.

*Id.* at 72-73. Upon inquiry by the trial court regarding whether S.K. thought that it was dangerous for Mother to pull away in the pick-up truck with P.K. and him in the truck bed, he testified "Yeah. I can't really remember, but I'm pretty sure by the time that happened -- because my mom told me that [Father] was . . . on her, that could have been the reason she probably got her leg pushed down and probably hit the gas and then immediately stopped." *Id.* at 73-74. In his testimony on May 25, 2018, S.K. did not provide his custody preference. *See* N.T., 5/25/18, at 104-105.

F.K., age eight and in fifth grade on February 3, 2017, testified that he would like "to live with my mom and my dad, like maybe they both would have . . . shared time." On May 25, 2018, he testified, "I want to live with my mom and have like my dad come in the summer." N.T., 5/25/18, at 113.

N.K., age seven and in second grade on February 3, 2017, testified on direct examination by Mother's counsel:

Q. You've lived with your mother. And how did you like that, when you lived with your mother?

A. I mean, I didn't really like it too much, but I kind of liked it. I mean, I'd rather -- I like living [in Doylestown rather] than Hawaii, because like if I was going to travel there, it would take ten hours. So I kind of like staying here.

*Id.* at 116. On May 25, 2018, N.K. testified that she likes living with Father, and she remembers liking it when she lived with Mother. N.T., 5/25/18, at 141-142. N.K. did not express a custody preference.

By order dated June 11, 2018, and entered on June 22, 2018, the trial court issued a final order granting Father primary physical custody and Mother partial physical custody from June 18, 2018, until July 30, 2018, to be exercised in Pennsylvania, New Jersey, and/or New York. Beginning in 2019, the order granted Mother partial physical custody for six weeks each summer, during every Easter Break, and at specific times during odd and even years for Christmas Break in Hawaii if Mother participates in eight counseling sessions, at minimum, for the following purpose:

[to help Mother] understand why she withholds the children from Father, her interference with Father's relationship with the children and her inability to acknowledge that Father has a role in the children's lives. These sessions must be completed by November 1, 2018, and shall be with a licensed psychologist or therapist with a Ph.D.

Order, 6/11/18, at ¶ 6; *see also id.* at ¶ 3(b) – (d). The order directed that, if Mother fails to complete the therapy sessions, then she shall exercise her partial custody in Pennsylvania, New Jersey, and/or New York and not in Hawaii. *Id.* at ¶ 6(d). In addition, the order granted Mother physical custody

- 7 -

for the Thanksgiving holiday during even years in Pennsylvania, New Jersey, and/or New York. Further, the order provided that, if Mother is in the continental United States, she may have an additional four weekends of physical custody during the school year in Pennsylvania, New Jersey, and/or New York. Finally, the order granted the parties shared legal custody except for decisions regarding the selection and treatment of the children by a psychologist or psychiatrist, for which the order granted Father sole legal custody.

Mother, through counsel, timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on August 10, 2018.

On appeal, Mother presents the following issues for our review:

1. Did the court err[] by not ordering that primary physical and shared legal custody be awarded to Mother. . .?

2. Did the court abuse its discretion in ordering that Father shall have sole legal custody of the children with respect to the selection and treatment of the children by a psychologist or psychiatrist?

3. Did the court abuse its discretion in [¶] 3(a) of the [subject] custody order that Mother . . . "shall have partial physical custody of the children from 9:00 a.m. on June 18, 2018 until 8:30 p.m. on July 30, 2018. This custody shall occur in the Pennsylvania, New Jersey, and/or New York area"?

4. Did the court err by issuing an order on March 31, 2016 granting temporary sole custody to [Father]?

5.  Did the court abuse[] its discretion in finding ". . . Mother has some paranoid tendencies in that she believes the court systems in Hawaii and Pennsylvania are biased against her and this is the reason she doesn't have custody"?

6.  Did the court abuse its discretion in its assessment of the relocation factors?

Mother's brief at 4-5.

Our standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**C.R.F., III v. S.E.F.**, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

Further, we have stated the following.

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

**Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa. Super. 2006), *quoting* **Jackson**

**v. Beck**, 858 A.2d 1250, 1254 (Pa. Super. 2004).

Pursuant to the Child Custody Act ("Act"), 23 Pa.C.S. §§ 5321-5340, in considering modification of an existing custody order, "a court may modify a custody order to serve the best interest of the child." 23 Pa.C.S. § 5328(a). "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well[-]being." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006), *quoting* **Arnold v. Arnold**, 847 A.2d 674, 677 (Pa. Super. 2004). Section 5328(a) provides the following enumerated list of factors a trial court must consider.

**§ 5328. Factors to consider when awarding custody.**

**(a)** *Factors.* – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Instantly, because neither Mother nor Father was seeking to relocate, but only the children would be moving a significant distance if Mother's petition for modification was granted, Mother's petition "does not *per se* trigger [S]ection 5337 of the . . . Act." **D.K. v. S.P.K.**, 102 A.3d 467, 477 (Pa. Super. 2014). Nevertheless, we have held, "[t]rial courts should still consider the relevant factors of [S]ection 5337(h) in their [S]ection 5328(a) best interest analysis." **Id.** at 477-478. We have explained, "several of the relevant factors of [S]ection 5337(h) are encompassed, directly or implicitly, by the custody factors listed in [S]ection 5328(a). Any relevant [S]ection 5337(h) factor that is not expressly encompassed in [S]ection 5328(a) should be considered by the trial court under the catchall provision of [S]ection 5328(a)(16)." **Id.** at 478. The Section 5337(h) relocation factors are as follows.

**§ 5337. Relocation.**

**(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

     (3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

     (4) The child's preference, taking into consideration the age and maturity of the child.

     (5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

     (6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

     (7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

     (8) The reasons and motivation of each party for seeking or opposing the relocation.

     (9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

     (10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

Here, the trial court recited and reviewed all of the Section 5328(a) best interest factors and the Section 5337(h) relocation factors in its memorandum opinion accompanying the subject order. *See* Trial Court Opinion, 6/11/18, at 2-18. In its Rule 1925(a) opinion, the trial court addressed Mother's asserted errors.

The trial court explained that it fashioned the subject order, in part, due to finding,

> Father is more likely to permit contact [between the children and Mother] based on the history of this case. . . . Mother has withheld the children a total of four times in violation of court orders: She withheld the children twice for short periods of time when she was in the New York area in 2011; she withheld [N.K.] from approximately November, 2012 until July, 2013; and then she withheld them a fourth time in March and April, 2016, when she did not return the children to Father after Spring Break. Mother had in fact enrolled the children in school in Hawaii in April 2016 and planned to keep them there without agreement.

Trial Court Opinion, 6/11/18, at 2 (footnote omitted).

In her first and second issues on appeal, Mother asserts that the trial court erred in denying her petition for primary physical and shared legal custody. Specifically, she asserts that the court abused its discretion by failing to consider the impact of Father's 1997 court-martial. We disagree.

Contrary to Mother's assertion, the court did consider the history of Father's court-martial. The court explained as follows in its opinion accompanying the subject order.

> Mother asserts that Father is a rapist and a Federal convicted sex offender. She is incorrect. She bases her assertion on the records of Father's court-martial in 1997, when he was 27 years old and a Captain in the United States Army.

> Father's testimony regarding the incident that led to his court-martial is that when he was 27, he was drunk and undressed and climbed through the window of the apartment of a female U.S. Army JAG Officer under the mistaken belief that when they had been together earlier in the evening, she indicated that he should come to her apartment. When he climbed into her bed, she woke up, screamed, and he was subsequently arrested and dishonorably discharged from the service.

- 14 -

Father pled guilty to two charges under the Uniform Code of Military Justice, including unlawful entry into the apartment of another with intent to commit a criminal offense, and wrongfully committing indecent acts with another. He was not convicted of Rape or Sexual Assault. Father's testimony is consistent with the court-martial record. **While we certainly do not condone Father's behavior, we do not find it significant for this custody dispute. There is no evidence of any other such incident, and Mother knew of this incident prior to her marriage to Father.** . . . Mother, who cannot say anything positive about Father, did not indicate any improper behavior on Father's part with respect to the children. Her mantra is "I am the Mother, he is a rapist, give me the children."

Trial Court Opinion, 6/11/18, at 14-15 (citations to record omitted) (emphasis added).

The court found that Mother had improperly characterized Father's court-martial record throughout the underlying matter. The court explained:

Mother sent a copy of the court-martial to the children's school saying that Father was a rapist. She also sent a copy to the children's therapist stating that the therapist did not protect the children from a rapist. Mother did not consider the impact upon the children of sending these records to the school. Father is not a rapist and he is not a convicted sex offender. He was convicted of wrongfully committing indecent acts with another[,] which falls short of the type of offense Mother claims.

*Id.* at 15 (citations to record omitted).

Moreover, the court found that Mother has improperly used this information to alienate P.K. from Father. The court explained:

More troubling is an entry in [P.K.]'s diary from July 27, 2017, when [P.K.] was 15, in which she wrote "[Father] is a rapist. He makes me sick with that. How the f[---] does he have custody of us. I'm absolutely disgusted with him and our justice system."

Father had introduced this diary entry as evidence that Mother told [P.K.] that Father was a rapist, even though Mother denied stating that to [P.K.] Mother said that [P.K.] would explain this and another entry exhibit, which clearly indicates that Mother and [P.K.] discussed ahead of time how [P.K.] would respond to the introduction of this entry into evidence.

Incredibly, [P.K.] denied that her Mother told her that her Father was a rapist, even though this has been a constant refrain of Mother. [P.K.]'s testimony is that she somehow realized that Father was either a murderer or a rapist and she decided he was a rapist. This is the most dramatic example of how Mother is turning at least [P.K.] against Father.

*Id.* at 10-11 (citations to record omitted). Upon careful review of the testimonial and documentary evidence, we discern no abuse of discretion with respect to the weight the trial court placed upon Father's 1997 court-martial in fashioning its physical and legal custody award.

Next, Mother asserts that the court failed to weigh appropriately Father's decision to send the three older children to live with her in Hawaii allegedly by the end of March of 2014, when he possessed sole legal and physical custody, and without notice to the children. Mother claims that Father's conduct in this regard was "rash" and "reflected instability." Mother's brief at 20.

In its opinion accompanying the subject order, the trial court found as follows.

Father has also engaged in questionable conduct involving the children's custody, albeit to a much lesser extent than Mother. Despite court . . . orders on January 17, 2013 and May 14, 2013 granting him sole legal and physical custody of the children, Father sent the children to Hawaii to live with Mother in two steps: He first sent [F.K.] in July, 2013, and then he sent [P.K.] and [S.K.] to Hawaii on May 31, 2014. Father testified that he had an agreement with Mother that he could come out to visit the

- 16 -

children, and although he went out three times in June, July, and
October of 2014, he had only one real visit in July, and he did not
see the children at all on the last visit in October. Father,
however, had never asked the Bucks County Court to modify or
vacate the Bucks County Order entered in January, 2013, giving
him sole legal and physical custody of all four children, despite
Mother's repeated requests that he place in writing his agreement
for the children's move to Hawaii. This complicated the situation
and may have led, in part, to Mother's restriction of Father's
access to the children.

Trial Court Opinion, 6/11/18, at 3-4.

Nevertheless, in its Rule 1925(a) opinion, the court disagreed that

Father's decision was "rash" and "reflected instability." Rather, the court

found that his decision "may have been imprudent in hindsight, [but] we

believe it was based upon a consideration of the children's situation since they

were not seeing their mother at all after she elected to improperly leave the

Pennsylvania area in December, 2012." Trial Court Opinion, 8/10/18, at 9.

The court explained:

Mother had fled to Hawaii with [N.K., the youngest child] in late
2012[, when she was three years old]. In July 2013, Father sent
[F.K.] to live with Mother. He explained that because [F.K.] was
sad and missed [N.K.] and his mother, and [N.K.] was alone and
"was not going to be returned to Pennsylvania despite my urging,"
he felt that it would be appropriate to send [F.K.] to Hawaii "so at
least two children will be together." He observed that the children
were "struggling" after their mother returned to Hawaii, and then
sent [P.K.] and [S.K.] to Hawaii on May 31, 2014. In her appeal,
Mother incorrectly says that [P.K.] and [S.K.] were sent on March
31, 2014. This is not true. They were sent at the end of the
school year on May 31, 2014.

- 17 -

*Id.* at 8-9 (citations to record omitted).  Upon review, we discern no abuse of discretion with respect to the weight that the court placed on Father's conduct in this regard.

Further, Mother asserts that the court abused its discretion in finding Section 5328(a)(10) in favor of Father, *i.e.*, which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.  Mother claims that she has always provided excellent care for the children.  She criticizes Father by baldly asserting that he is unable to function in a work setting since he is unemployed.[6]

The court thoroughly addressed Mother's assertion in its Rule 1925(a) opinion.  In essence, the court disagreed that Mother has always provided excellent care for the children.  Rather, the court found that Mother "does not encourage the relationship between Father and the children."  Trial Court Opinion, 8/10/18, at 10.  The court concluded, "Mother's withholding of the children and her continuing disregard for the court orders entered in this matter also reveal her inability to understand and provide for the children's stability and psychological needs and well-being."  *Id.*  Upon review, we discern no abuse of discretion by the court.  We adopt as our own the court's

_____

[6] The trial court addressed Father's unemployment in its opinion accompanying the subject order.  The court found that he takes medication for anxiety and depression, which "contributes to his not working. . . . However, especially since he usually has help [from his paramour] with his children-rearing duties, we do not find that any mental health issues impair Father's care of the children."  Trial Court Opinion, 6/11/18, at 14.

- 18 -

disposition of Mother's assertion regarding Section 5328(a)(10). ***See*** Trial Court Opinion, 8/10/18, at 9-11.

Finally, Mother disagrees with the trial court that the "primary problem [in this custody case] is that Mother does not acknowledge that Father has a role in the children's lives and she has withheld the child(ren) on at least four occasions. . . . Father at all times has agreed to arrangements with her to share . . . custody [of the children]." ***Id.*** at 2. Rather, Mother asserts that the primary problem in this case "is forcing the children to stay with the parent they do not want to live with." Mother's brief at 21.

The trial court explained in its Rule 1925(a) opinion, "Mother's position is that the children want to live with her and, therefore, they should. We disagree. . . . Mother has overemphasized the importance of this factor, [Section 5328(a)(7),] and she has ignored all of the other custody factors[,] which are effectively equally weighted or favored Father. As a significant example, Mother has on several occasions prior to the entry of [the subject order] improperly withheld the children from Father." Trial Court Opinion, 8/10/18, at 5.

This Court has explained,

Although the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. The weight to be attributed to a child's testimony can best be determined by the judge before whom the child appears. The child's preference must be based upon good reasons and his or her maturity and intelligence must also be considered.

- 19 -

*Ketterer v. Seifert*, *supra* (internal quotations and citations omitted). "The significance placed on the preference of the child who is at the center of the custody dispute is similarly within the discretion of the trial judge." *Masser v. Miller*, 913 A.2d 912, 920 (Pa. Super. 2006).

In analyzing the children's custody preferences, the court credited Father's testimony "that when the children are with their Mother, they feel loved, and they want to see their Mother." Trial Court Opinion, 6/11/18, at 9 (citations to record omitted). The court found that P.K. has consistently stated that she wants to live with Mother, but that Mother "is clearly pressuring her. Mother told [P.K.] that [P.K.] could apply to an exclusive high school in Hawaii. Mother told [P.K.] not to get on the plane unless it is to Hawaii. Mother said that she told [P.K.] that Father read [P.K.]'s journal." *Id.* (citations to record omitted). With respect to S.K. and F.K., the court found that their custody preferences have varied, as follows.

> On July 28, 2015, [S.K.] said that while Mother was pressuring him to say he wants to live in Hawaii, he wanted to stay in Doylestown and spend the summer in Hawaii. On February 3, 2017, he said he wanted to live with Mother in Hawaii, and then on May 25, 2018, he cautiously stated that he had no opinion as to a preference. [F.K.] had said that he wanted shared time between Mother and Father, and then on May 25, 2018, he said that he wanted to live with Mother "and have like my dad come in the summer."

*Id.* (citations to record omitted). The court found that the youngest child, N.K., stated on February 3, 2017, "she does not like Mother and does not want

to talk about it, and then on May 25, 2018, she did not volunteer a preference." *Id.*

The court recognized the children's conflicting preferences over the years and between each other. However, the court did not place determinative weight on their preferences. Significantly, the court weighed their preferences against, in part, Section 5328(a)(4), the need for stability and continuity in the child's education, family life and community life. The court found that the children have lived with Father continuously since November of 2014, and that they "lead stable lives in Doylestown. [P.K.] is a very good student. [S.K.] and [F.K.] are more average[,] and [N.K.] is too young to evaluate. They attend the local public schools, have friends and engage in various activities both with friends and with Father." Trial Court Opinion, 6/11/18, at 7.

Moreover, the court found that the children are suffering emotionally due to the custody dispute.[7] The court reasonably concluded that the children need stability and continuity, and that Father can provide it. The court also recognized that, despite the children's differing preferences, "separating them may cause additional trauma." *Id.* at 9. Based on our review of the record

_____

[7] With respect to P.K., the court emphasized her diary entry of March 22, 2016, "prior to Mother taking the children for spring break, when she wrote, 'I think this is my last night in this house for a while. I don't think I'm gonna be able to talk mom outa taking me to Hawaii. Although I hope I can. Please let her be reasonably [sic]. I don't want to reset again.'" Trial Court Opinion, 6/11/18, at 8 (citation to record omitted).

evidence, we discern no abuse of discretion by the court in not placing determinative weight in this case on the children's preferences.

In her third issue, Mother asserts that the court abused its discretion by granting her partial physical custody in the Pennsylvania, New Jersey, and/or New York area from 9:00 a.m. on June 18, 2018, until 8:30 p.m. on July 30, 2018. Specifically, she asserts that she is employed as a nurse in Hawaii, and it is "unreasonable to expect her to have meaningful partial physical custody of the children when she is forced to leave her employment for extended periods of time." Mother's brief at 26.

Because the partial custody award that Mother challenges involves a provision specific to the summer of 2018, we conclude that this issue is moot. Therefore, we do not consider it. *See In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) (stating, "An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.") (citation omitted).

Even if not moot, we would conclude that Mother's third issue is without merit. The trial court explained, "Given Mother's continuous disobedience and violation of prior court custody orders, both here and in Hawaii, this provision was reasonable since Mother is a school nurse who does not go back to work until August, and she has a place for herself and the children with her [f]ather in Staten Island." Trial Court Opinion, 8/10/18, at 13. Upon review, we conclude that the trial court did not abuse its discretion in this regard.

In her fourth issue, Mother asserts that the court violated her guarantee of due process of law under the Fourteenth Amendment to the United States Constitution on March 31, 2016, when the court allegedly issued the existing temporary custody order *ex parte*. Because the subject order replaced the existing custody order, we conclude that this issue is likewise moot. **See In re D.A.**, **supra**.

In her fifth issue, Mother asserts that the court abused its discretion in finding that she "has some paranoid tendencies in that she believes the court system in Hawaii and Pennsylvania are biased against her and this is the reason she doesn't have custody." Mother's brief at 28. The trial court discussed Mother's "paranoid tendencies" in its consideration of Section 5328(a)(15), the mental and physical condition of a party. **See** Trial Court Opinion, 6/11/18, at 13-14. In its Rule 1925(a) opinion, the court set forth its factual findings in support of its conclusion that Mother has "paranoid tendencies," which the record evidence supports. **See** Trial Court Opinion, 8/10/18, at 15. The court did not find that Mother has a diagnosed mental or physical condition, but that she "does not take any responsibility for the situation in which she finds herself. . . . It is easier for her to blame others. She stated that her children have been 'legally kidnapped.'" Trial Court Opinion, 6/11/18, at 13-14 (citation to record omitted). We discern no abuse of discretion. Mother's fifth issue fails.

In her sixth and final issue, Mother asserts that the trial court abused its discretion in its assessment of the Section 5337(h) relocation factors. The trial court thoroughly considered the relocation factors in its opinion accompanying the subject order. *See* Trial Court Opinion, 6/11/18, at 16-18. The court found determinative Section 5328(a)(5), whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party, and Section 5328(a)(8), the reasons and motivation of each party for seeking or opposing the relocation. Specifically, the court found that Mother "has an established pattern of interfering with Father's relationship with the children. Father wants to share the children." *Id.* at 17. Further, the court found that Mother wants the children to reside in her primary physical custody in Hawaii "so she will have the children to herself for the majority if not all of the time." *Id.* The record overwhelmingly supports the court's findings. As such, we discern no abuse of discretion in the court's assessment of the Section 5337(h) factors. Accordingly, we affirm the custody order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/16/19

- 24 -

*See Attached*
*D. Kilkenny*
*S. Smith*

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
### FAMILY DIVISION

R    S    K              :            NO. A06-12-61169-C

v.                        :

D.   L    K              :            IN CUSTODY



Case #: 2012-61169-0237 C   11907877
Main (Public)
Code 144      Judge:34
Rcpt Z2000765  6/11/2018 1:32:34 PM

### MEMORANDUM OPINION AND ORDER

On October 5, 2016, D    K.     ("Mother") filed a Petition for Custody of her four minor children, P K  , S K  F K    and N K , and a Petition to Relocate the children from Pennsylvania to Hawaii where she lives. R     Ki     ("Father") opposed the relocation and petitioned for primary custody of the children to remain in Bucks County, Pennsylvania. A significant issue in this case is Mother's repeated contemptuous behavior in withholding the children from Father. Complicating the situation is the desire of most of the children to live and/or spend a significant amount of time with Mother in Hawaii. After ten (10) days of hearings and a review of the records in Bucks County and the State of Hawaii, including the many hearings beginning in 2011, this Court determined that the parents shall have joint legal custody, and that Father shall have primary physical custody and Mother shall have partial physical custody. We offer this Opinion in support of our decision.

Mother (DOB     ) is a Registered Nurse who works in the school system in Hawaii. She makes approximately $65,000.00 per year. Father (DOB      ) is a graduate of Princeton University, and has not worked in any significant capacity since 2007. He testified that he is a "stay-at-home dad" and has approximately $40,000.00 to $50,000.00 in income from his late Mother's estate. Father has a live-in girlfriend, who also has an income of approximately

$40,000.00 working for an insurance agent. Father and his girlfriend live in Doylestown, Bucks County, in a house he inherited from his late Mother who died in 2016.

The parents met and married in August, 2000, in Hawaii, and subsequently separated in June, 2011. After their separation, Mother flew to Staten Island, New York, from Hawaii with the children, where her father lived. Mother and Father thereafter began a series of custody court proceedings in Hawaii and Pennsylvania. Since the separation, Mother has been held in contempt by both the Hawaiian and Bucks County Courts for withholding the children. A time table of the significant events in this custody dispute is attached hereto as Appendix A. In arriving at our resolution to this dispute, we have addressed the factors both for custody and relocation below.[1]

## CUSTODY FACTORS:

1.    Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

Father is more likely to permit contact based on the history of this case. A review of the time table (Appendix A) shows that Mother has withheld the children a total of four times in violation of court orders: She withheld the children twice for short periods of time when she was in the New York area in 2011; she withheld N₁K from approximately November, 2012 until July, 2013;[2] and then she withheld them a fourth time in March and April, 2016, when she did not return the children to Father after Spring Break. Mother had in fact enrolled the children in school in Hawaii in April 2016 and planned to keep them there without agreement.

---

[1] While neither parent has raised the issue, it would appear that a consideration of the relocation factors may not precisely fit this situation. Mother has lived in Hawaii since she was 19, except for approximately one year beginning in June, 2011 and two years between 2005 and 2009. It is the children she is seeking to relocate to Hawaii.

[2] By sending F K₁ to join Mother and N₁K ₁ in July 2013, in Hawaii, we find Father tacitly approved of N K ₁'s move there as of that date.

2

As a result of Mother's withholding of the children in 2011, the Hawaiian Court issued orders granting Father temporary physical custody of the three older children.[3]

On November 8, 2012, Mother and Father agreed to a temporary Custody Order in which they agreed to follow the August 3, 2012 Hawaiian custody order which gave Father primary physical custody, and they were to go to mediation to determine the final custody arrangement. Mother sabotaged this agreement by returning to Hawaii with NK . without agreement in December, 2012. This resulted in an Order on January 17, 2013, giving Father sole physical and legal custody of all four children.

On October 19, 2015, the parents again reached an agreed custody arrangement in which Father had primary physical custody and Mother had partial physical custody for Christmas, spring break and most of the summer. When Mother illegally withheld the children in March, 2016, another contempt order was issued granting Father sole legal and physical custody of the children and suspending all of Mother's rights. Father then went to Hawaii to gain custody of the children with the assistance of the police. Mother attempted to flee with the children in a pick-up truck, and PK · fell out of the back of the truck. By her actions and conduct, Mother once again sabotaged an agreed-upon custody settlement, resulting once more in the temporary suspension of her custody rights.

Father has also engaged in questionable conduct involving the children's custody, albeit to a much lesser extent than Mother. Despite court contempt orders on January 17, 2013 and May 14, 2013 granting him sole legal and physical custody of the children, Father sent the children to Hawaii to live with Mother in two steps: He first sent FK 1 in July, 2013, and then he sent PK

---

[3] A custody evaluation ordered by the Hawaiian Court was never completed because both parents moved to the East Coast - Father to Doylestown, Pennsylvania and Mother to Staten Island, New York. However, it contained interviews with the parents and other relevant people. It also referenced court proceedings in Hawaii.

and S̶J̶ to Hawaii on May 31, 2014. Father testified that he had an agreement with Mother that he could come out to visit the children, and although he went out three times in June, July, and October of 2014, he had only one real visit in July, and he did not see the children at all on the last visit in October. Father, however, had never asked the Bucks County Court to modify or vacate the Bucks County Order entered in January, 2013, giving him sole legal and physical custody of all four children, despite Mother's repeated requests that he place in writing his agreement for the children's move to Hawaii. This complicated the situation and may have led, in part, to Mother's restriction of Father's access to the children.

After Mother filed a motion to transfer jurisdiction of the custody case to Hawaii on November 14, 2014, Judge Iha entered an Order on November 18, 2014, directing that the children were not to be removed from Hawaii. (*See* Exhibit M-11.) Despite Judge Iha's Order, Father came to Hawaii on November 24, 2014, and removed the children from their schools using the authority granted to him by the January, 2013 Order.[4] In response to this obvious violation, Father testified that he had two contradictory November 18, 2014 Orders. He claimed that he had one order preventing the children from leaving the islands which was stamped "Denied," and another handwritten order directing that the children were not to be removed from Hawaii, and so he therefore chose the order that allowed him to remove the children.

At an ensuing hearing on December 1, 2014, Judge Iha ordered Father to return the children to Hawaii by December 5, 2014. She explained that "what was denied was an ex parte motion to advance the hearing," and stated, "the children should not have been removed from school. This was not a planned move. You cannot keep just yanking the children back and forth." (*See* Exhibits

---

[4] We have concluded that Father took the children at that time because in approximately one week, all four children would have been in Hawaii and Hawaii would arguably have jurisdiction over this custody case.

4

M-2 and M2-A; N.T. 12/1/14, pp. 8, 17.) However, after a follow-up hearing on December 2, 2014, jurisdiction was determined to be in Pennsylvania so the children were never returned to Hawaii.

In addition to physically removing the children from contact with Father, Mother has also made statements that make clear her view of each parents' role in the children's lives. Father produced emails in which Mother says in essence "I am the Mother, I should have the children." (*See, e.g.,* Exhibit F-80.)

Neither parent has completely permitted free communication between the children and the other parent. For example, when the children were with Mother in Hawaii between 2013 and 2014, Father asserted that he could not talk to them. Mother responded that, except for Neasa, the children had cell phones and Father could call. Mother on the other hand has complained that since November of 2014, she has had maybe five phone communications with Neasa. We believe these communications have recently improved.

2. **The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.**

Although each parent has made allegations of abuse against the other and alleged that the other parent abused the children physically, there is no credible evidence of abuse between the parties and the children. Prior to separating, the parents had attended counseling and Mother only reported verbal abuse and not physical abuse. (*See, e.g.,* Exhibit F-13; N.T. pp. 37, 132).

At a hearing on October 10, 2012, Father's mother, ████████████ ("Grandmother"), was granted an 18 month Protection From Abuse ("PFA") order against Mother for two incidents that occurred in 2011.

The first incident occurred on July 7, 2011, when Mother and children were staying at Grandmother's home in Doylestown. Father was still in Hawaii and wanted to talk to P⎯K⎯⎯ on

5

the phone. When the Grandmother went to hand the phone to PK...., Mother screamed profanities and pushed Grandmother out of the way to get the phone and prevent PiK r from talking to Father. Grandmother received a bruise on her chest as a result of the shoving. (*See* N.T. 10/10/2012, pp. 21-25.)

The next incident occurred on December 16, 2011, when, due to a confusion in the schedule, both Mother and Grandmother went to pick up SK. and PiK from school. Grandmother had picked the children up in her car and when she stopped at a stop sign near the school, Mother opened the back door and pulled S K out of the car. Grandmother tried to push the car door closed, but Mother threw her out of the way and she stumbled and hit the ground. . (*See* N.T. 10/10/2012, pp. 8-12.)

Grandmother had withdrawn without prejudice the original PFA petition she had filed on July 14, 2011, but refiled another PFA petition on September 27, 2012, based upon both of the July and December, 2011 incidents, when she thought Mother was moving to Pennsylvania from Hawaii and Grandmother did not want Mother near her. Grandmother died in the summer of 2016. There had not been any further abuse allegations past 2011, and for purposes of this Custody Order this PFA order has limited relevance.

3.    **The parental duties performed by each party on behalf of the children.**

Mother has performed all traditional parental duties without assistance since separation. Prior to separation in June, 2011, Mother was the primary caretaker for children.

Father has not had custody of the children without assistance. When the Hawaiian Court awarded Father temporary legal and physical custody of the three older children in 2011, Father moved to Doylestown, Pennsylvania into Grandmother's house where she helped care for the children until her unexpected death in the summer of 2016. Since February 2014, Father's

6

girlfriend. K , M( , has lived with Father. They knew each other in high school and began a relationship while attending a committee to plan a high school reunion in March, 2013. Ms. M( ,' began living with Father in February, 2014, and helps Father take care of the children.

4. **The need for stability and continuity in the child's education, family life and community life.**

The children have lived continuously with Father since November, 2014. They have not seen their mother very often, in significant part because her custody time with them was suspended after her behavior and actions in withholding the children in March, 2016.

The children lead stable lives in Doylestown. P K is a very good student. S.K and F.K are more average and N K is too young to evaluate. They attend the local public schools, have friends and engage in various activities both with friends and with Father.

D M( , the mother of P K ..'s best friend, ι .. ,, testified on January 29, 2018. She described P K ·'s activities that she has observed as watching movies, lunches, Starbucks, and school trips. She basically described P K .. as a normal teenager and said P K r seems happy. (*See* N.T. 1/29/18, pp. 122-155.) We found Ms. M¯ ·'s testimony very credible and unbiased.

Neither parent seems to have considered the destabilizing effect upon the children when the parents have abruptly changed custody: The children have not been told why they suddenly went from one home to another. When Father suddenly appeared on November 24, 2014, and removed them from Hawaii, that was a traumatic event. When Mother kept them after the Spring Break in 2016, and Father came with the police in April 2016 and Mother attempted to flee with the children in her pickup truck and P K fell out of the back, that was another traumatic event.

In the CCES report dated June 9, 2015 (Exhibit F-15, p. 24), the evaluator states "the children all are suffering emotionally as a result of the custody dispute." Significantly, this report was generated in 2015 before the most traumatic custody change in April, 2016. According to the

7

CCES Report, PK stated that the uncertainty of the scheduling is the most difficult aspect of this custody dispute. (*See* N.T. 9/25/17, pp. 242, Exhibit F-15, p. 15.) PK 's emotional exhaustion is evident in her diary entry of March 22, 2016, prior to Mother taking the children for spring break, when she wrote, "I think this is my last night in this house for a while. I don't think I'm gonna be able to talk mom outa taking me to Hawaii. Although I hope I can. Please let her be reasonally [sic]. I don't want to reset again." (Exhibit F-92, 5/23/18).

These children need stability and continuity. Father will be able to provide that stability. The children have lived with Father continuously since November, 2014, and should continue to primarily live with Father. Even Father, however, has said the children need to see both parents (N.T. 1/31/18, p. 49.)

5.    The availability of extended family.

Both of the families of Mother and Father live in the New York, New Jersey and Pennsylvania area. Both parents have, in the past, taken the children to visit with relatives, in particular Mother's Father who lives on Staten Island, New York.

There are no relatives of either parent who live in Hawaii.

6.    The child's sibling relationships.

The children have been separated from each other for various times since June, 2011, but they still appear to be reasonably bonded to each other. Even PK who wants to live with her Mother has said in her interview in open court on May 25, 2018, that all four children should stay together.[5]

---

[5] Mother discharged her lawyer in September, 2017, and has been proceeding pro se. She requested that this Court speak to all four children. Therefore, since Mother was unrepresented, we interviewed the children in the courtroom. The children were comfortable with, or at least accepting of, the arrangement.

7. **The well-reasoned preference of the child, based on the child's maturity and judgement.**

In every custody interview and in her testimony, PK has consistently stated that she wants to live with Mother and spend summer with Father. (N.T. 7/28/15, p. 134.) Her mother is clearly pressuring her. Mother told PK that PK could apply to an exclusive high school in Hawaii (N.T. 9/25/17, p. 372.) Mother told PK not to get on a plane unless it is to Hawaii. Mother said that she told PK that Father read P.K.'s journal. (Id. at 106.)

The boys' positions have varied. On July 28, 2015, SK said that while Mother was pressuring him to say he wants to live in Hawaii, he wanted to stay in Doylestown and spend the summer in Hawaii. (N.T. 7/28/15, pp. 44, 96.) On February 3, 2017, he said he wanted to live with Mother in Hawaii, and then on May 25, 2018, he cautiously stated that he had no opinion as to a preference. FK had said that he wanted shared time between Mother and Father, (N.T. 2/13/17, p. 95), and then on May 25, 2018, he said that he wanted to live with Mother "and have like my dad come in the summer." On February 2, 2017, NK said she does not like Mother and does not want to talk about it, and then on May 25, 2018, she did not volunteer a preference.

Father testified that when the children are with their Mother, they feel loved, (N.T. 9/26/17, p. 98), and that they want to see their Mother (N.T. 1/31/18, p. 103).

These children have been through a lot, and separating them may cause additional trauma.

8. **The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.**

A. Mother has implied that Father would illegally take custody of the children. This, however, is behavior that Mother has repeatedly exhibited. Mother has, for example, told PK not to get on an airplane unless it is a Hawaiian plane. (*See* Exhibit F-35, 9/25/17.) Mother claims

9

that the children are afraid because of the extent that Father went through to not let the children see her. (*See* N.T. 8/25/17, p. 349.)

Furthermore, there is nothing to support Mother's testimony that Father speaks negatively to the children about Mother. The children said that Father does not speak negatively of Mother. Father testified that when the children return from visiting Mother, they are very disrespectful towards him and call him names such as "loser." These names echo the type of names Mother calls Father in her emails to him. We concluded that Mother says negative comments to the children in general.

Mother and PK have a very close relationship. PK has completely bought into her Mother's narrative that Father is no good and that PK should be with Mother basically full-time. An example of what Mother tells P K is the exchange of text messages on August 21, 2017 in which Mother suggests that P K should sneak away from Father and meet Mother somewhere to go see the eclipse. In that exchange, Mother tells PK how mean Father is and PK agrees. (*See* Exhibit F-36, 9/25/17.)

More troubling is an entry in PK 's diary from July 27, 2017, when P K was 15, in which she wrote "RS K is a rapist. He makes me sick with that. How the fuck does he have custody of us. I'm absolutely disgusted with him and our justice system." (Exhibit F-106, 5/25/18.)

Father had introduced this diary entry as evidence that Mother told PK that Father was a rapist, even though Mother denied stating that to PK. Mother said that PK would explain this and another entry exhibit, which clearly indicates that Mother and PK discussed ahead of time how PK would respond to the introduction of this entry into evidence.

Incredibly, P.K denied that her Mother told her that her Father was a rapist, even though this has been a constant refrain of Mother. PK 's testimony is that she somehow realized that

10

Father was either a murderer or a rapist and she decided he was a rapist. This is the most dramatic example of how Mother is turning at least PK against Father. (For a discussion of Father's court-martial in which he pled guilty in 1998 to indecent assault, which Mother continues to insist was a rape, see custody factor 16 below.)

B.     Mother's emails to Father are demeaning and contain accusations as to what Father is saying about the other parent to the children. For example, Mother wrote on March 16, 2017, "you truly need to get back on your meds...you need help. Get some," and on March 26, 2017, "stop making my children hate you...Get your head out of your asshole. Send back my kids, give me some money, buy a sailboat and live on it Ala Wai." (Exhibit F-80.) Mother also asserts that the children say that Father tells them she is a criminal. (N.T. 8/12/16, p. 38.) The children deny this.

Father's emails are more factual, and he testified that he looks through PK 's diary to see if she and Mother have a plan for PK to go to Hawaii. Father also testified that P.K tells him that he is a rapist. (N.T. 9/26/17, p. 187.) We find his testimony credible on this issue.

9.     **Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.**

Father is more likely to maintain such a relationship. While we do not think he considered the impact on the children when he removed them from Hawaii in November, 2014, his behavior in general has been positive. Mother on the other hand seems to be waging a campaign to have the children to herself without much, if any, contact with Father, and to that end she has engaged in behavior damaging to the children as recently as April, 2016. Father has acknowledged the necessity for Mother to be in the children's lives and is willing to share the children. Mother is not.

11

10. **Which party is more likely to attend to the daily, physical, emotional, developmental, educational and special needs of the child.**

Both parties may attend to the physical needs of the children. Mother consistently says she is a good Mother.[6] She is not a good mother. Because of Mother's behavior in terms of withholding the children and in not considering their relationship with their Father, Mother does not appropriately attend to the emotional or psychological needs of the children.

11. **The proximity of the residences of the parties.**

Mother lives in Hawaii. Father lives in Doylestown, Pennsylvania. Neither parent is willing to move to the vicinity of the other parent. At this point, we note that the children have been established in the Central Bucks School District continuously since November, 2014. We consider it unreasonable to uproot them again. In addition, Mother does not own any property in Hawaii and her occupation as a Registered Nurse is transferrable to the East Coast. Mother refuses to consider such a move.

12. **Each party's availability to care for the child or ability to make appropriate child-care arrangements.**

Both parents are available to care for the children or make appropriate child care arrangements.

13. **The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.**

This is a high conflict custody dispute that has been going on for seven years. While both sides share some blame, Mother's inability to acknowledge that Father has a significant role in the

_____

[6] Mother also consistently says she is not a criminal. However, on September 28, 2012, she pled *nolo contendere* under Bucks County Docket No. CP-09-CR-0000928-2012 to Simple Assault, 18 Pa.C.S.A. § 2701(a)(1), a misdemeanor of the 2nd degree, against Grandmother. She has a criminal record.

children's lives and her repeated behavior in withholding the children is the principal stress factor creating conflict.

Until Mother can accept Father's role in the children's lives, the high level of conflict will continue.

**14.  The history of drug or alcohol abuse of a party or member of a party's household.**

Father asserts that Mother abuses alcohol. There is evidence to support this contention. Mother had a DUI in the 1990's and two DUI's that were expunged - one in 2013 and one in 2015. Apparently there was an issue involving the testing machines (N.T. 8/12/16, p. 53.) While legally Mother had no DUI arrests in 2013 and 2015, it is a possible indication of alcohol abuse. We do not find, however, that such abuse would prevent her from caring for the children based on the record we have.

Father has had alcohol issues in the past when he was in college and in the military, but does not currently present any concerns.

**15.  The mental and physical condition of a party or member of a party's household.**

There is no evidence that Mother has a diagnosed mental or physical condition. However, Mother has some paranoid tendencies in that she believes the court systems in Hawaii and Pennsylvania are biased against her and this is the reason she doesn't have custody.[7] There is no evidence that the Courts are biased. It is Mother's views and actions that are the problem.

Mother does not take any responsibility for the situation in which she finds herself. She apparently has no ability to appreciate that her behavior in withholding the children has limited

---

[7] Judge Rubenstein recused himself when he determined that one of his grandsons was a friend of NK . (*See* April 6, 2017 transcript.)

13

her custody. It is easier for her to blame others. She stated that her children have been "legally kidnapped." (*See* N.T. 9/26/17, p. 5.)

Mother asserts Father has psychological problems. To some extent she is correct. Father acknowledges that he currently takes medication for anxiety and depression. He does not work even though he is now only 48 years old. He has not worked for any significant period of time since he and Mother returned to Hawaii from Florida in 2007, where they had been for two years, and stated that his mother supported the family. When asked why he does not work, Father explained that the children need him. That was not a satisfactory answer for this Court. In 2007, the parents were living together and Mother was a stay-at-home mom. Father could easily have gone to work then, and since all the children are in school, he could certainly work now. We have concluded that the extent of Father's anxiety and depression contributes to his not working and it is greater than he states. However, especially since he usually has help with his children-rearing duties, we do not find that any mental health issues impair Father's care of the children.

16.    Any other relevant factors.

Mother asserts that Father is a rapist and a Federal convicted sex offender. She is incorrect. She bases her assertion on the records of Father's court-martial in 1997, when he was 27 years old and a Captain in the United States Army. (*See* Exhibit M-14, "General Court-Martial Order Number 9, 24 April 1988." 9/21/17.)

Father's testimony regarding the incident that led to his court-martial is that when he was 27, he was drunk and undressed and climbed through the window of the apartment of a female U.S. Army JAG Officer under the mistaken belief that when they had been together earlier in the evening, she indicated that he should come to her apartment. When he climbed into her bed, she

14

woke up, screamed, and he was subsequently arrested and dishonorably discharged from the service.

Father pled guilty to two charges under the Uniform Code of Military Justice, including unlawful entry into the apartment of another with intent to commit a criminal offense, and wrongfully committing indecent acts with another. He was not convicted of Rape or Sexual Assault. Father's testimony is consistent with the court-martial record. While we certainly do not condone Father's behavior, we do not find it significant for this custody dispute. There is no evidence of any other such incident, and Mother knew of this incident prior to her marriage to Father. The incident is described in the CCES report (*see* Exhibit F-15, 9/21/17, p. 8), and most importantly, even Mother, who cannot say anything positive about Father, did not indicate any improper behavior on Father's part with respect to the children. Her mantra is "I am the Mother, he is a rapist, give me the children."

Mother sent a copy of the court-martial to the children's school saying that Father was a rapist. (Exhibit F-17, 9/21/17.) She also sent a copy to the children's therapist stating that the therapist did not protect the children from a rapist. (Exhibit F-18, 9/21/17.) Mother did not consider the impact upon the children of sending these records to the school. Father is not a rapist and he is not a convicted sex offender. He was convicted of wrongfully committing indecent acts with another which falls short of the type of offense Mother claims. Father went to the school and explained the situation. He is still allowed at the school. We also note that the school was familiar with the parties since Mother had been banned from the school grounds after the December, 2011 incident in which she pushed Grandmother to the ground.

15

## RELOCATION FACTORS:

While both parents have treated this custody dispute as a relocation case, it is not. In D.K. v. S.P.K, 102 A.3d 467, 468 (Pa.Super. 2014), the Superior Court of Pennsylvania noted that in cases

> where neither Mother nor Father is relocating and only the children stand to move to a significantly distant location, the relocation provisions of the Child Custody Act, 23 Pa.C.S.A. § 5337, are not *per se* triggered.... However, in such cases, the trial court shall consider the relevant factors set forth in Section 5337 (h) insofar as they impact the final determination of the best interests of the children."

We will address the relocation factors below, but we note some overlap the custody factors discussed previously.

1. **The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.**

The children love their Mother and want to see her as well as their Father. PK definitely has a close relationship with her Mother. Mother, however, is pressuring PK to choose Mother over Father, and it is not a healthy relationship.

The positions of the other children vary.

2. **The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.**

The children have lived in Hawaii before so they would adjust to relocation. However, they are settled in Bucks County and there is no good reason to uproot them.

3. **The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.**

The relationship between the children and Father would not be preserved if the children relocated to Hawaii.

16

4. The child's preference, taking into consideration the age and maturity of the child.

P K wants to live with her Mother. The preference of the two boys varies. N K , at least in the past, does not want to really see her Mother.

5. Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

Mother has an established pattern of interfering with Father's relationship with the children. Father wants to share the children.

6. Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

This factor is not relevant. Neither parent is relocating.

7. Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

While the children would probably do well in Hawaii as they did in the past, there is nothing to suggest that such relocation would enhance the general quality of life for the children above and beyond what they have been provided in Bucks County.

8. The reasons and motivation of each party for seeking or opposing the relocation.

Mother wants the relocation so she will have the children to herself for the majority if not all of the time.

9. The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

As we noted under Custody Factor 2 above, although each parent has made allegations of abuse against the other and alleged that the other parent abused the children physically, there is no credible evidence of abuse between the parties and the children. Prior to separating, the parents had attended counseling and Mother only reported verbal abuse and not physical abuse.

17

10. **Any other factor affecting the best interest of the child.**

None.

## CONCLUSION:

We have find that it is in the best interest of all four children that Father should have primary physical custody of all of the children. The difficulty is determining what partial physical custody to award Mother given her history of withholding the children and her view of Father's limited role in the children's lives. This issue is complicated by the distance between the parents. The best solution would be for Mother to relocate and engage in therapy on the East Coast to determine why she wants to exclude Father. However, that is unrealistic.

Since June, 2017, whenever Mother has been in Pennsylvania, we have entered interim Orders giving her unsupervised partial physical custody. We also entered a holiday interim Order. These interim Orders all specifically state that Mother shall not take the children to Hawaii. Mother has obeyed these Orders. She also says that she has been punished by not seeing the children from April 4, 2016 until June 8, 2017, and that she has learned her lesson. We will see.

At the conclusion of testimony in this matter on May 25, 2018, we directed the parties to submit briefs, including an analysis of the custody and relocation factors, and a proposed form of custody order. Mother proposed in her custody order that she be given sole legal custody of the children and that Father be required to come to Hawaii for his partial custody and visitation with the children. In contrast, Father proposed in his custody order that Mother have significant periods of partial custody of the children in the summer and a holiday schedule but that all of Mother's partial custody occur on the East Coast of the continental United States.

After reviewing the parties' respective proposals and considering the history of this case, we have determined that it is appropriate to adopt Father's recommendation in part and require

18

that Mother's first period of partial custody with the children occur on the East Coast in the Pennsylvania, New Jersey and/or New York area.

We have further concluded that it is not financially feasible or practical for Mother to exercise all of her partial physical custody with the children on the East Coast. We are concerned by Mother's past contemptuous behavior, and the only action that has made an impression upon Mother is the restriction of her custody of her children. This, however, has had the effect of harming the children. Therefore, we have attempted to build in a safeguard and will permit Mother to eventually take the children to Hawaii with the provision that she first attend therapy. We believe that Mother's cooperation in this process and acceptance of therapy would start to lower the level of conflict between the parties and benefit the children. This Court cannot, however, control Mother's behavior, and all we can do is direct her to attend the therapy sessions. We cannot predict the consequences.

Under our Order, Mother will have partial physical custody of the minor children under an increasing schedule. Her first period of partial custody will be June 18, 2018 to July 30, 2018, on the East Coast. This is the time that Father suggested. Furthermore, before she may take the children for any partial custody time in Hawaii, she shall attend at least eight (8) therapy sessions with a licensed Ph.D. psychologist to start to try and understand her destructive behavior in withholding the children, her interference with Father's relationship with the children and her inability to acknowledge that Father has a role in the children's lives. If Mother is compliant in attending these court-ordered therapy sessions, then she will be permitted to take the children to Hawaii for some of her partial physical custody time.

We have excluded Dr. Allman or a friend of his from being the psychologist for the therapy because in the CCES custody evaluation report Dr. Allman expressed a clear bias in that he

19

"believes that mothers are better for children emotionally than are fathers." (*See* Exhibit F-15, 9/21/17, p. 18.) This would only reinforce D. K.'s view and be counter-productive for counseling.

For the reasons above we enter the attached Custody Order.

BY THE COURT:

SUSAN DEVLIN SCOTT, J.

6/11/18

20

APPENDIX "A"



R  'S  .K  — v. D.  .L  K.
Bucks County Docket No. A06-2012-61169-C
Time table of significant events

Aug. 8, 2000      Parties marry in Hawaii after meeting in 1998

2005              Parties move to Florida

April  2007       Parties return to Hawaii

Hawaiian Court   (First Circuit – State of Hawaii FC-D No. 11-1—1029)

June 1, 2011      Mother flies to NY (Staten Island- her Father's home); keeps
                  children in New York; subsequently asks to live with B  .
                  K        ' (Paternal Grandmother) in Doylestown.

June 16, 2011     Father files Complaint in Divorce in Hawaii

July 14, 2011     Grandmother files for PFA in Bucks County against Mother
                  after phone incident in home and police called. Mother not
                  served and hearing continued. Petition withdrawn on 9/14/2011
                  without prejudice.

Aug. 16, 2011     Ex parte Order: Father awarded temporary sole legal and
                  physical custody of children. Mother ordered
                  to return children to Father in Hawaii immediately.

Aug. 24, 2011     Mother held in contempt. Father is granted temporary sole legal
                  and physical custody of all 4 children. Mother ordered to
                  transfer children at Newark Airport on Friday, August 26, 2011.

Aug. 26, 2011     Father flies to Newark Airport and retrieves children.

Sep. 12, 2011     Order for Pre-Decree Relief awarding custody of children to
                  Father.

Oct. 10, 2011     Mother returns to marital residence in Hawaii but then returns
                  to New York with children several days later.

1

| | |
|---|---|
| Nov. 3, 2011 | Order: Grandmother awarded physical custody of children. Mother ordered to turn custody of children to Grandmother by 11/5/11 at 4:00 pm. |
| Nov. 10, 2011 | Order to enforce custody transfer: Mother found in contempt of Nov. 3, 2011 Order (F-3); Mother refuses to disclose children's location. |
| Nov. 14, 2011 | Father relocates to Doylestown from Hawaii. |
| Nov. 15, 2011 | New York police assist in transferring custody of children from Mother to Grandmother. |
| Nov. 17, 2011 Nov. 22, 2011 | Custody Hearings - Parties testify and represented by counsel. |
| Dec. 14, 2011 | Custody Order: Grandmother awarded temporary physical custody of three eldest children. Mother awarded temporary physical custody of youngest child. Parties have temporary joint legal custody of all four children. Mother has visitation 12/9-11/2011 and 12/23/2011-1/3/2012 and first, second and fourth weekends of each month |
| Dec. 16, 2011 | Physical altercation between Grandmother and Mother in Doylestown as Mother attempts to pick up PK and SK. (Parties had agreed to Mother's non-scheduled visitation with children on 12/16/2011.) Mother arrested and charged with interference of custody of children, simple assault, disorderly conduct and engaging in fighting. |
| Dec. 16, 2011 | Court issues orders awarding Grandmother temporary custody of youngest child NK until further court order. |
| Dec. 20, 2011 | Sua sponte hearing in Hawaii before Judge Catherine Remigio. Parties represented by counsel. Court "finds none of the witnesses entirely credible" but finds Grandmother's version "more credible." |

2

Dec. 21, 2011    . Order and findings of fact by Judge Remigio after sua sponte hearing: Grandmother has temporary sole legal custody of all 4 children and physical custody of 3 older children. Mother retains temporary custody of NK . Mother's visitation to be supervised by her father A₁ T₁ ₂. Mother not allowed on . children's school grounds. (F-4 p. 28)

Another hearing scheduled for 1/26/2012 which will include custody evaluation.

Jan. 26, 2012    Hearing on status of custody evaluation report. Rescheduled to 3/29/12 for custody evaluation report. (Final report never issued as Father asserted Pa. jurisdiction.)

Agreed custody schedule: parents have joint legal custody. Father has primary physical custody. Mother has alternate weekends- exchanges at Bridgewater NJ Police Station

July 13, 2012    Order by Judge Remigio transferring custody to PA.

Aug. 3, 2012    Court Order after hearing on July 9, 2012 re Father's Motion for Pre-Decree Relief filed May 8, 2012.

Father awarded temporary sole legal and physical custody of 3 oldest children.

Mother has temporary sole legal and physical custody of NK . If mother returns to mainland, parents alternate weeks in summer until school year when prior academic schedule ordered by court resumes. Mother has weekend schedule.

**Bucks County Court (No. A06-2012-61169-C)**

May 30, 2012    Father files for custody in Bucks County.

Sep. 7, 2012    Mother files Petition for sole legal custody of children in New York state court. .

Sep. 12, 2012    Bucks County custody conference held and report issued.

3

Sep. 25, 2012     Father files emergency petition for special relief and contempt. (Alleges Mother filed action in NY state and brought children back late to school.)

Sep. 27, 2012     Grandmother re-files Petition for Protection From Abuse (PFA) against Mother as result of Dec. 16, 2011 incident involving custody transfer altercation

Oct. 10, 2012     Judge Clyde Waite grants 18 month PFA order for Grandmother against Mother after hearing (AO6-11-62084-A).

Nov. 8, 2012      Agreed temporary Order
                  Father represented by counsel; Mother pro se
                  Parents agree to follow the Aug. 3, 2012 Hawaiian Order with minor modifications to agreement to go to mediation with custody therapist (did not occur). Custody transfer to occur at Bridgewater NJ Police Station.

Dec. 2012         Mother returns to Hawaii with NK without Father's agreement.

Dec. 21, 2012     Father files contempt and request for modification of custody.

Jan. 9, 2013      Father files contempt and petition to modify custody.

Jan. 17, 2013     Contempt hearing - Judge Rubenstein presiding.
                  Both parties represented by counsel, Father present.
                  Order- Mother in contempt; Father given temporary sole legal and physical custody of all 4 children; bench warrant for Mother issued.

Spring 2013       B. K travels to Hawaii to attempt to obtain custody of NK but Mother refuses to turn over child to her.

May 3, 2013       Father files petition for contempt of January 17, 2013 Order

May 7, 2013       Contempt hearing (Judge Rubenstein). Father and Grandmother present. Mother represented by counsel. Father to have sole legal and physical custody of all four children. Mother ordered

4

to transfer N K to Father within 60 days of date of order. Bench warrant remains outstanding for Mother. Order issued May 14, 2013.

| | |
|---|---|
| July 19, 2013 | Father sends F K to Hawaii by agreement. (*see* Mother's motion to transfer jurisdiction) |
| May 31, 2014 | Father sends S K  and P K to Hawaii by agreement. |
| Oct 7-11, 2014 | Father and K  M  visit Mother's home in Hawaii. |
| Oct. 27, 2014 | Mother files Renewed Ex Parte Motion Regarding Immediate Temporary Custody and Shortening Time For Hearing in Hawaii. |
| Nov. 12, 2014 | Hearing in Hawaii – Judge Sherri Iha presiding. Mother represented by counsel. |
| Nov. 14, 2014 | Mother files Motion to Transfer Jurisdiction to Hawaii. (Problem notice issued by Master – a Rule needs to be issued; motion not filed until 11/25/14.) |
| Nov. 18, 2014 | Judge Iha (Hawaii) issues order after hearing on 11/12/2014 continuing matter to 12/17/2014 and orders children "not to be removed from Island of Oahu pending further Court order." |
| Nov. 18, 2014- | Judge Rubenstein and Judge Iha conference - determine children resided in Hawaii for 6 months; jurisdiction in Hawaii |
| Nov. 24, 2014 | Father travels to Hawaii and removes children back to Pennsylvania. |
| Nov. 25, 2014 | Mother files emergency petition to modify custody in Bucks County. |
| Dec. 1, 2014 | Hearing in Hawaii before Judge Iha re: Mother's ex parte motion for immediate temporary custody and Father's violation of Judge Iha's 11/18/2014 Order. |

5

Father ordered to return children to Hawaii but then directed to call in at 8:30 next morning for telephone hearing.

Dec. 2, 2014    Judge Rubenstein and Judge Iha hold telephone hearing; parents testify. Decision: children have not resided in Hawaii for at least 6 months as alleged and jurisdiction to remain in Bucks County. Mother alleges bias by Judge Rubenstein because he is allegedly friends with Grandmother.

Dec. 9, 2014    Mother files petition to confirm relocation and modify custody.

Dec. 16, 2014    Mother files petition for recusal.

Jan. 12, 2015    Hearing before Judge Rubenstein. Mother's motion for recusal withdrawn.
Testimony re Mother's Petitions for Custody and Relocation not completed (hearing stopped during cross- examination of Mother; Father had not testified).
Parties directed to obtain private custody evaluation. No further hearings until completion of custody evaluation.
Custody order of 11/8/2012 to remain in effect.
Children not to be removed from Bucks County.
Mother may have partial custody in Bucks County.

Jan. 20, 2015    Father files petition for contempt.

Jan. 21, 2015    Father files petition to modify custody.

Feb. 6, 2015    Mother files petition for contempt of 1/12/2015 order.

Feb. 10, 2015    Mother files amended petition for contempt of 1/12/2015 order.

Feb. 11. 2015    Mother files petition for contempt of 1/12/2105 order.

April 27, 2015    Order: parties to obtain CCES custody evaluation.

June 9, 2015    CCES report- parties joint legal; father primary physical, mother partial custody.

6

| July 15, 2015 | Judge Rubenstein hears testimony from P'K and S'K. |
| July 28, 2015 | Discovery hearing- Father ordered to produce records on discharge from military and provide information on all medications he is taking for mental health or sign release for Mother's counsel. |
| Oct. 19, 2015 | Agreed Order entered after hearing with parties and their counsel present: Parties have shared legal custody; Father has primary physical custody and Mother partial physical custody; Children to reside with Father during school year and with Mother during the summer vacation and spring break; Parties share holidays with odd and even years; Mother to have additional custody time with 30 days written notice to Father. |
| March 29, 2016 | Father files petition for special relief requesting bench warrant after Mother fails to bring back children from spring break and he determines children are in Hawaii via cell phone app. |
| March 31, 2016 | Judge Rubenstein issues Bench Warrant (logged into National Crime Information Center) for Mother for failure to bring children back to Pennsylvania at end of Spring Break on March 28, 2016. Sua sponte Order- Father granted sole legal and physical custody of all 4 children and all Mother's custody rights are suspended pursuant to Oct. 19, 2015 agreement. |
| April 3, 2016 | Father flies to Hawaii with girlfriend K M. |
| April 6, 2016 | Children returned to Pennsylvania- Father obtained custody of the children on April 5, 2016, in Hawaii with the aid of police after altercation with Mother in her pickup truck. |
| April 27, 2016 | Judge Rubenstein rescinds the bench warrant but denies Mother's motion for reconsideration of 3/31/2016 temporary |

7

custody order. Judge Rubenstein's March 29, 2016 sua sponte Order suspending Mother's custody remained in effect until the first hearing before the undersigned on June 8, 2017

| | |
|---|---|
| June 6, 2016 | Mother files expedited custody petition (to reinstate Oct 19, 2015 custody order). |
| Aug. 8, 2016 | Mother files petition to approve relocation and modify March 31, 2016 temporary order. |
| Aug. 12, 2016 | Hearing on Mother's Petition for Custody and Relocation. Judge Rubenstein dismisses Mother's petitions after her refusal to answer questions on cross concerning a DUI arrest in September 2013 (no conviction). Mother is not precluded from filing further petitions to modify custody. |
| Aug. 22, 2016 | Mother files appeal from Aug. 12, 2016 order - says Order final as no new hearing scheduled. Judge Rubenstein says Mother may refile custody petitions. |
| Aug. 22, 2016 | Mother files motion for reconsideration of Aug. 12, 2016 order. |
| Sep. 14, 2016 | Superior Court issues order directing trial court to enter an order of court no later than September 19, 2016, as there is no Aug. 12, 2016 order on trial court docket. |
| Sep. 19. 2016 | Judge Rubenstein enters order granting Mother's request to transcribe children's notes of testimony and dismissing Mother's petitions to reinstate prior custody order and relocate to Hawaii |
| Sep. 22, 2016 | Mother files petition to approve relocation and modify March 31, 2016 temporary custody order.<br><br>Mother files motion for recusal alleging conflict due to Judge Rubenstein's grandson and NJK in same class. |
| Sep. 27, 2016 | Mother files amended petition for relocation and modification of March 31, 2016 custody order. |

8

Oct. 5, 2016    Mother files another petition to approve relocation and modify March 31, 2016 custody order.

Oct. 11, 2016    Mother files emergency motion for immediate reinstatement of Mother's custody rights and order for immediate custody.

Nov. 22, 2016    Mother files another motion for recusal.

Dec. 19, 2016    Superior Court quashes Mother's appeal as interlocutory.

Feb. 1, 2017    Mother's motion to recuse denied after hearing.

Feb. 3, 2017    Custody hearing. Judge Rubenstein hears from all 4 Children *in camera*.

Feb. 16, 2017    Order for custody hearing on 4/6/2017.

Mar. 10, 2017    Mother files petition for contempt of 7/28/15 Order alleging Father failed to "exercise due diligence in obtaining military records."

April 6, 2017    Judge Rubenstein issues Order recusing himself.

Order signed by Judge Rubenstein scheduling a custody hearing before the undersigned on June 8, 2017 on Mother's petition for custody relocation.

April 11, 2017    Mother files expedited petition for custody.

May 15, 2017    Mother files amended petition for contempt of 7/28/15 discovery order.

June 8, 2017 to date    Hearings before the undersigned have been held on the following 10 dates: 6/8, 9/21*, 9/25, 9/26/17, 1/29, 1/30, 1/31, 5/23, 5/24, 5/25/18

On each of those dates, Orders have been entered giving Mother partial physical custody of the minor child when she is present on the East Coast.

* Exhibit M-14 introduced at hearing on 9/21/17: Father's 4/24/1998 court-martial order: Father pleaded guilty to Charge I, unlawful entry into the apartment of another with intent to commit a criminal offense (indecent acts upon another); and Charge II, wrongfully committing indecent acts with another on 6/30/1996. Sentenced to forfeit all pay and allowances and discharged from U.S. Army.